UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal Action No. |
| ) | 5:22-cr-00033-KKC-MAS |
| v. ) | |
| ) | |
| JORGE GONZALEZ MONTEAGUDO, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**RELEASE OPINION & ORDER**

After conducting a joint detention hearing for Defendants Miguel Angel Homedes ("Homedes") and Jorge Gonzalez Monteagudo ("Monteagudo") and carefully reviewing the related record, the Court denies the Government's detention motion for the reasons detailed in this opinion and under the standards of the Bail Reform Act ("BRA"). The Court further outlines the specific conditions that it concludes will reasonably assure that Defendant appears at all future proceedings in this case and that Defendant does not pose any danger to others or to the community. A companion opinion releasing Homedes simultaneously issues.[1]

The Court's analysis in these related cases proceeds from the statutorily informed premise that a rebutted presumption, even in a case involving a large quantity of narcotics, does not categorically require detention; the BRA's burden-shifting structure otherwise would collapse. On

---

[1] The Court's companion opinions substantially overlap, given the similarities in these Defendants' backgrounds, their related roles in the alleged offenses, and the notable absence in both records of many aggravating factors typical in detention cases involving drugs and international travel. Homedes's and Monteagudo's BRA-relevant commonalities ultimately drive mirroring outcomes. The Court remains mindful of the factual nuances between the Defendants in engaging each analysis.

1

the flight front, the Court thus confronts whether conditions exist to manage a defendant with legal status in the United States but some family abroad and a history of lawful, legitimate international travel. The Court next decides whether conditions can address the danger risk of a defendant playing a cameo role—albeit one involving an aggravated quantity of cocaine—in a larger alleged conspiracy, absent any other danger indicators on the current record.

The Court answers both questions affirmatively in this case, per the respective evidentiary standards and for the reasons here thoroughly outlined.

## I.  BACKGROUND

Homedes, Monteagudo, and four co-defendants first appeared before the Court on criminal Complaints. [*See United States v. Monteagudo*, 5:22-mj-05092-MAS-1, at E.C.F. Nos. 1 (Compl.) and 1-1 (Joint Aff.); *United States v. Homedes*, 5:22-mj-05093-MAS-1, at E.C.F. Nos. 1 (Compl.) and 1-1 (Joint Aff.)]. The Complaints allege that each defendant conspired to distribute a mixture or substance containing cocaine, in violation of 21 U.S.C. § 846. A Joint Affidavit supports the Complaints against all six co-defendants. The allegations generally arise out of a late 2021 and early 2022 investigation into a suspected drug trafficking organization ("DTO") operating in and around Lexington, Kentucky.

At their initial appearances on the Complaints, the United States sought both Homedes's and Monteagudo's detention pursuant to 18 U.S.C. § 3142(f)(1)(C), and the Court scheduled a joint detention hearing. In the interim, the grand jury returned an Indictment charging Homedes, Monteagudo, and their co-defendants with conspiring to distribute and possessing with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a) and 846. [DE 11]. The Court arraigned both Defendants immediately prior to commencing the joint detention hearing, triggering the detention presumption under § 3142(e)(3)(A). The United States sought detention on both flight and danger bases as to both Defendants, pursuing primarily a danger theory

as to each. The Court heard the United States' joint proof as to both and heard individual arguments and proffer as to each Defendant, affording the parties all rights secured by the BRA.

For the reasons that follow, the BRA requires Monteagudo's release.

## II.  BRA FRAMEWORK

The charges in the Indictment give rise to a presumption of detention under the BRA as to both nonappearance and danger risk. 18 U.S.C. § 3142(e)(3)(A). The Court assesses the presumption under the BRA and *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010). *See also United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (imposing a burden of production on the defendant to produce "some evidence that he will not flee or endanger the community if released" to meet the presumption); *United States v. Hernandez*, 2002 WL 1377911, at *2 (E.D. Tenn. Feb. 27, 2002) (characterizing the production burden as "the burden of producing probative, credible evidence to rebut the presumption and support [the defendant's] contention that he will appear . . . and he does not pose a danger"). This production burden is "not heavy." *See Stone*, 608 F.3d at 945 (noting the duty to "introduce at least some evidence").

If the presumption is met, the burden shifts back to the United States. Detention based on danger must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f). A flight-based (or nonappearance-based) detention decision must be supported by a preponderance of the evidence. *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, 2006 WL 2037406, at *6 (E.D. Ky. Jul. 18, 2006). The analyses are distinct, and conditions that could adequately address flight will not necessarily sufficiently mitigate danger. *See United States v. Mercedes*, 254 F.3d 433, 436-37 (2nd Cir. 2001). Further, almost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicted compliance with conditions. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (evaluating predicted good faith compliance as critical release component). The success of any

3

potential release conditions ultimately turns on a defendant's likelihood of compliance. *United States v. Hir*, 517 F.3d 1081, 1093 n.13 (9th Cir. 2008) (stating that any set of conditions barring a "replica detention facilit[y]" necessarily would "hinge on [the defendant's] good faith compliance").

### III.   ANALYSIS

The Court concludes that Monteagudo has overcome the presumption as to flight or nonappearance risk and as to danger risk. On this record, the United States has not shown in response, by a preponderance, that no combination of conditions can reasonably assure that Defendant will not flee and that he will appear at future proceedings in this case. Nor has it shown by clear and convincing evidence that no combination of conditions can reasonably assure that Defendant will not pose a danger to others or to the community. Rather, though some flight and/or nonappearance[2] and danger risks do exist, the Court is persuaded that it can craft conditions to effectively target them and provide the reasonable assurances required under the BRA.

The Court here discusses the factors underlying the flight and danger considerations and explains the responsive conditions that govern the terms of Monteagudo's release.

**A.   FLIGHT RISK**

To rebut the presumption, Defendant emphasized the 28 years he has spent in the United States and his close relationship with his naturalized United States citizen wife, his work history as a contracted over-the-road truck driver, and his lack of criminal history or related appearance issues. [*See* Pretrial Services Report ("PSR") at 1-2]. Nor is there any dispute that Defendant was legally present in the United States at the time of the alleged offenses; there is thus no immigration-related flight issue. These facts provide at least some probative, credible evidence of Defendant's

---

[2] For ease of use, the Court refers to both equally and interchangeably as "flight risk" in this opinion; the distinction between the terms is immaterial in this case.

entrenchment and stability in the United States, his legal status here, and his ability to avoid criminal trouble, all decreasing the likelihood that Defendant would flee or fail to appear for court in this case. *See* 18 U.S.C. § 3142(g)(3)(A) (considering the defendant's family ties, length of residence in the community, past conduct, and record concerning court appearances); *Stone*, 608 F.3d at 945 (emphasizing that the burden is not heavy and requires only some credible evidence).

Thus, the Court finds that Defendant has rebutted the presumption of detention as it pertains to flight. In response, the United States must demonstrate by a preponderance of the evidence that, when considering the information in the § 3142(g) factors, no conditions can reasonably guard against flight.

### 1. Nature and Circumstances of the Offense

The first factor looks to "the nature and circumstances of the offense charged, including whether the offense . . . involves . . . a controlled substance[.]" 18 U.S.C. § 3142(g)(1). The charges in this case involve an aggravated quantity of cocaine and a potential mandatory minimum incarceration sentence, though Defendant may ultimately qualify for 18 U.S.C. § 3553(f) (safety valve) relief. *See United States v. Shuklin*, No. 19-4171, 2020 WL 2992522, at *1 (6th Cir. Mar. 18, 2020) (observing that "significant penalties" may "provide a strong incentive to flee"). The detention presumption triggered by the drug allegations persists as a consideration despite Defendant's threshold rebuttal. The alleged circumstances of the offense—overlapping with Monteagudo's employment as an over-the-road truck driver—are also somewhat aggravating in the flight context, as they suggest some degree of connection between Defendant's job (and frequent long-distance travel in the course of it) and drug trafficking conduct. As Defendant conceded, the first flight factor weighs in favor of pretrial detention.

### 2. **Weight of the Flight Evidence & Defendant's History and Characteristics**

The second factor is "the weight of the evidence against the person[.]" 18 U.S.C. § 3142(g)(2). In the flight context, this looks only toward the weight of flight risk evidence, not toward the weight of proof of Defendant's guilt. *See United States v. Sykes*, No. 04-cr-80623, 453 F. Supp. 3d 1011, 1015–16 (E.D. Mich. Apr. 13, 2020) (citing *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010)) (noting that, in this Circuit, the § 3142(g)(2) factor looks only to the weight of the evidence that the defendant is a flight risk or a danger); *accord United States v. Sanders*, 466 F. Supp. 3d 779, 785 (E.D. Mich. 2020). The Court considers the second factor in relation to and conjunction with the third, Defendant's history and characteristics, as that information informs the weight-of-the-evidence analysis. *See* 18 U.S.C. § 3142(g)(3). Though the (g)(3) evidence as to Defendant's flight risk is mixed, his background lacks concerns present in other cases where detention has been warranted, and the information ultimately demonstrates that the Court can in fact impose adequate conditions to address the risks that are present. Ultimately, the second and third flight factors collectively favor Defendant's release.[3]

First, though Defendant is legally present in the United States and has resided in this country for 28 years, his community ties are only to Austin, Texas, rather than to Lexington (the charging district). Some courts, including the Ninth Circuit, have extended the community ties concept in the BRA to the defendant's community of residence, wherever located. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (holding that "'community' in this section of the statute embraces both the community in which the charges are brought and also a community in the United States to which the defendant has ties"). The Sixth Circuit has not adopted this approach, but it generally has found lack of ties to the charging district a meaningful aggravator

---

[3] The fourth BRA factor, the nature and seriousness of the danger risk, is inapplicable in the flight context. The Court discusses it *infra* in relation to danger.

only where coupled with non-citizenship or strong international entanglement. *See United States v. Guerra-Rodriguez*, 59 F.3d 171 (6th Cir. 1995) (finding that the court "properly considered defendant's [Mexican] citizenship and his lack of ties to Tennessee as factors in evaluating the risk of flight").

Other courts have proceeded similarly, looking for other, additional flight evidence to tip the scales, such as use of fraudulent documentation, access to substantial international funds, or suspicious, frequent international travel or long-term international residence. *See, e.g.*, *United States v. Patel*, 685 F. App'x 323, 324 (5th Cir. 2017) (declining to decide whether the community ties concept is limited to the charging district because "even assuming the district court should have also considered ties to the United States" generally, other considerations favored detention, including strong ties to India and access to fraudulent documentation); *United States v. Ho*, No. 3:16-CR-46-TAV-HBG-1, 2016 WL 5875005, at *5 (E.D. Tenn. Oct. 7, 2016), *aff'd sub nom. United States v. Szuhsiung Ho*, No. 16-6561, 2016 WL 10077327 (6th Cir. Dec. 9, 2016) (finding the defendant's ties problematic where, among other things, he spent an average of 300 days per year living abroad); *United States v. Bikundi*, 47 F. Supp. 3d 131, 137 (D.D.C. 2014) ("The Court finds that the defendant has continuing significant foreign ties to her country of origin, including potential access to funds located in Cameroon, and that this raises a significant concern about her serious risk of flight."); *United States v. El-Hage*, 213 F.3d 74, 80 (2d Cir. 2000) (emphasizing the defendant's history of residing in other countries).

Such aggravating facts are not present in Monteagudo's background. There is no evidence of any funds or accounts abroad, and Monteagudo has legal status in the United States. He also lacks any criminal history, and he has resided in the United States for nearly three decades, punctuated by international travel only for short periods for visits and medical care. Importantly,

7

there is no evidence in the record that Defendant's historical travels to Mexico have been criminal or otherwise illegitimate. Monteagudo self-reported to the Probation Office that he travels to Mexico "on a regular basis" to attend medical appointments for himself and for his wife and to visit her family that resides there, with his last visit either in December 2021 or January 2022. [PSR at 2].

The United States did not argue that the travel frequency exceeded the scope of Monteagudo's specific, reasonable proffered explanations, and—critically—it did not suggest that the travel was drug-related. *Compare United States v. Beltran-Morales*, No. 5:21-CR-137-KKC-MAS, at E.C.F. No. 27 (finding detention warranted based on flight risk where the defendant had traveled to Mexico several times per month for a decade and 13 times in the two months preceding indictment and offered only vague explanations for the travel, without citing specific individuals that he was visiting or events he was attending, and such explanations were inconsistent and suspicious in connection with the drug allegations). Nor does the record reflect any travel to Cuba, Monteagudo's country of birth, despite his representation that he maintains telephonic contact with his mother and siblings that reside there. [PSR at 2]. Defendant's relationship and residence with his wife of more than 15 years further anchors him to the Austin, Texas area and to the United States. His physical and emotional support for his wife, who is ill, too disincentivizes him to violate travel restrictions or other conditions of release and risk pretrial detention. Moreover, his wife traveled from Texas to be present with Monteagudo at the detention hearing, and counsel proffered that she is willing to aid in Monteagudo's compliance and to report any perceived violations. For these reasons, in this particular case, the Court does not find that Defendant's lack of ties to the Lexington community in particular necessarily favors his detention.

Finally, although Defendant's employment has a problematic recent tie to the alleged criminal activity, counsel proffered that Monteagudo has been consistently employed during his time in the United States, specifically in over-the-road trucking for several years, and that he has past relevant work experience in construction and could readily find alternative employment. [Hearing Recording at 57:30]. This augurs well for his release compliance generally and for the Court's oversight abilities. *Cf. United States v. Stidham*, No. 3:10-CR-79, 2010 WL 2639925, at *3 (E.D. Tenn. June 25, 2010) (finding that a defendant's long unemployment favors detention). Further encouraging in these regards is the lack of any substance use disorder history in Defendant's background. *See United States v. Valentin-Cintron*, 656 F. Supp. 2d 292, 296 (D.P.R. 2009) (observing that a "frequent drug user . . . constitutes a 'flight risk.'"). These facts provide a constant, reliable foundation upon which the Court can build appropriate conditions and have reasonable confidence in their success.

### 3. Availability of Flight Conditions

Accordingly, though the record does demonstrate some flight risks in this case, the Court is able to craft conditions that can effectively target the salient concerns.

First, and most critically, the Court will limit Defendant's international and domestic travel significantly. Defendant will be required to surrender his passport, and the Court will restrict his travel to the Western District of Texas (including the Austin, Texas area) and to the Eastern District of Kentucky for case-related travel. The Court will also place Defendant on home detention in Austin and require him to submit to GPS monitoring to ensure that the Probation Office has maximum oversight capabilities. The Court finds that Austin, where Defendant resides with his wife and has lived for 28 years and has family and friends, will provide a stable and predictable release environment. The Court is optimistic that Monteagudo's family in Austin and his decades-long immersion in the community fabric there will support and motivate his compliance with

release conditions. *See, e.g.*, *United States v. Garcia*, No. 1:20-CR-81 (2), 2020 WL 4937131, at *2 (S.D. Ohio Aug. 24, 2020) (noting that the defendant's role in "provid[ing] emotional support to his family" weighed "against the likelihood that [he] would flee"). Additionally, to the extent Defendant's trucking work presents an issue, the Court will require Defendant to cease engaging in over-the-road truck driving and to actively seek or obtain more stationary employment at a position approved by the Probation Office, in its discretion.

Evaluation of the information reflected in the relevant § 3142(g) factors, including all aggravating considerations supported by the record and possible mitigating conditions, thus supports release. The Court concludes that, given Defendant's relatively limited risks of flight or nonappearance on this record, the stated travel restrictions and home detention and monitoring conditions will reasonably assure his appearance in this case. *See United States v. Demmler*, 523 F. Supp. 2d 677, 684 (S.D. Ohio 2007) (finding that GPS monitoring could "adequately alert law enforcement if [the defendant] attempts to flee" and concluding that "given the otherwise low likelihood of flight[,]" it would adequately safeguard against any nonappearance risk); *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992) ("Section 3142 does not seek ironclad guarantees, and the requirement that the conditions of release reasonably assure a defendant's appearance cannot be read to require guarantees against flight.") (internal quotation marks omitted).

Because the Court believes that these conditions will reasonably assure Monteagudo's future appearance and his lack of flight, it cannot find by a preponderance that no combination of conditions could do so. The BRA thus requires release.

**B.    DANGER RISK**

Monteagudo likewise rebutted the presumption as to danger risk. He emphasized the absence of any violent or other criminal history, his lack of substance use disorder issues, and his

10

close relationship with his wife as a compliance motivator. These facts provide some credible proof that the Court could craft conditions to effectively assure community safety in this case. The Court thus finds the low presumption hurdle cleared, and it is the United States' obligation to point to clear and convincing evidence in the record establishing that no conditions can reasonably assure community safety.

1. **Nature and Circumstances of the Offense**

In considering whether the evidentiary bar is reached, the Court first considers "the nature and circumstances of the offense charged, including whether the offense . . . involves . . . a controlled substance[.]" 18 U.S.C. § 3142(g)(1). The alleged offenses, by their nature, involve possession with intent to distribute and conspiracy to distribute cocaine, a dangerous controlled substance. The nature of the charges thus weighs in favor of detention and triggers the applicable presumption, which persists as a danger consideration.

The circumstances of the offense have mixed impact. It is concerning that Defendant is alleged to have been involved with a large quantity of cocaine (5 kilograms or more) and to have targeted the Lexington area for this criminal activity absent apparent legitimate ties to the region. However, as discussed more fully in relation to the second and third BRA danger factors, the concrete evidence depicts only Defendant's isolated involvement in the alleged criminal events, lessening the risk that he will return to trafficking conduct if released pretrial.

In any event, and as Defendant conceded at the hearing, the first danger factor weighs decidedly in favor of detention, on balance.

2. **Weight of the Danger Evidence & Defendant's History and Characteristics**

The Court next considers "the weight of the evidence against the person[.]" 18 U.S.C. § 3142(g)(2). "This factor goes to the weight of evidence of dangerousness, not the weight of the evidence of defendant's guilt." *Stone*, 608 F.3d at 948. The Court confines the relevant BRA

11

analysis to danger risk and makes no elemental assessment of the alleged offenses or any "pretrial determination of guilt[.]" *Id.* (quoting *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991)). The primary danger risk in this case is the risk of continued drug trafficking, as Defendant lacks any history of violence or weapons use. *See United States v. Hare*, 873 F.2d 796, 798-99 (5th Cir. 1989) (stating "the risk of continued narcotics trafficking on bail constitutes a risk to the community.")

Analysis of the second factor merges with the third in the danger context, as with flight in this case. 18 U.S.C. § 3142(g)(3). Defendant's lack of criminal history and lack substance use disorder issues are critical mitigators, particularly when coupled with the absence of non-speculative evidence of Defendant's deeper or longitudinal involvement in the drug trade. Collectively, these considerations demonstrate little risk that Defendant would return to drug trafficking if released, and the limited risks that do exist can be adequately managed with conditions.

Monteagudo's factual connection to the alleged DTO is relatively slim; the direct evidence of his involvement pertains only to one date. The investigation into this DTO intersected with Defendants Homedes and Monteagudo in the early hours of February 28, 2022, at a rest stop just north of exit 127 on I-75. [Joint Aff. ¶ 10]. Investigators had trailed a Hyundai Elantra (the "Elantra") and a Honda Civic (the "Civic") to the rest stop via vehicle tracking information obtained with state court authorization. Co-Defendant Orlando Perez Tadeo ("Perez") was driving the Civic. Co-Defendant Saul Vera ("Vera") drove the Elantra, with Co-Defendant Daniel Corona Serratos ("Corona") riding in the Civic as a passenger. At the rest stop, investigators observed Corona exit the Civic and stand near it, when Monteagudo (then unknown to officers) approached Corona and greeted him. At the detention hearing, the United States admitted a portion of the

12

body camera footage from the scene, which depicted Corona and Monteagudo interacting in an obviously friendly, familiar manner. [Hearing Recording at 19:55; DE 18, Exhibit 1 (Video Surveillance)].

After Monteagudo greeted Corona, Homedes approached the pair from the restroom building area of the rest stop and handed a light-colored duffel bag to Corona, which Corona immediately placed in the Elantra's rear passenger compartment. DEA Task Force Officer Travis Steward ("TFO Steward") testified at the detention hearing, consistent with the body camera footage presented, that Homedes also appeared to investigators to be familiar with Corona. [Hearing Recording at 21:50]. Perez had remained in the Civic throughout the transaction, apparently observing the events at the rest stop. After the duffel bag exchange, Corona returned to the Elantra, and both the Civic and the Elantra departed the rest area simultaneously.

Investigators continued to visually monitor and follow the Civic and the Elantra as they traveled on I-75. [Joint Aff. ¶ 11]. They ultimately conducted a traffic stop on the Elantra in Lexington; after a drug canine alerted to the odor of narcotics in the vehicle, officers searched the car and located a light-colored duffel bag in the passenger side compartment that matched the bag from the observed rest stop exchange. [*Id.* ¶ 12]. A search of the bag revealed 10 individual brick-shaped, vacuum-sealed packages that field-tested positive for cocaine. The substance, including packaging, weighed approximately 13.6 kilograms.

Law enforcement also visually surveilled and followed Homedes and Monteagudo after the duffel bag exchange. [Joint Aff. ¶ 14]. Investigators observed the two enter and depart the rest stop in a semi-truck, with Homedes driving. Officers followed the semi-truck from the Georgetown, Kentucky area to Paris, Kentucky, taking what investigators deemed a notably inefficient route. In Paris, law enforcement conducted a traffic stop on the semi-truck. [*Id.* ¶ 15].

After receiving *Miranda* advisements, Homedes and Monteagudo agreed to speak with law enforcement. Homedes stated that he and Monteagudo were friends and colleagues and were traveling from Texas to Paris to deliver the cargo in the semi-truck. Homedes denied meeting or handing a duffel bag to anyone at the rest stop earlier in the day but acknowledged that they had stopped there to switch drivers. Monteagudo too advised that they had stopped at the rest area to exchange drivers but did recall Homedes exchanging a duffel bag, though he stated that he was unaware of the bag's contents and that he did not know the bag's recipient. A search of the semi-truck followed but revealed no evidence of drugs, currency, or other unlawful items.[4]

As law enforcement was surveilling and intercepting the Elantra and the semi-truck occupied by Homedes and Monteagudo, investigators continued to monitor Perez in the Civic via both physical and GPS tracking. [Joint Aff. ¶ 13]. Perez returned to 2170 Fort Harrods Drive, where investigators understood that the DTO utilized two apartments. Investigators observed Perez enter one of the apartments and return with a black backpack before entering the passenger seat of a Toyota Tacoma (the "Tacoma") also understood by law enforcement to be used by the DTO. A subsequent search of the Tacoma at a traffic stop, after a positive alert from the drug canine, uncovered approximately 556.1 gross grams of cocaine and more than $10,000 in United States currency. Co-Defendant Jose Nava Ramirez ("Ramirez") had been driving the Tacoma.

The Joint Affidavit and hearing testimony further offer some historical background information about the investigation into this DTO. In December 2021, after conducting controlled

---

[4] Per TFO Steward, an initial canine sniff failed to alert to the semi-truck, indicating that no contraband was present. A search of the semi-truck nonetheless ultimately followed Homedes's and Monteagudo's arrests and the discovery of narcotics in the Elantra. No evidence was found in the semi-truck. Officers conducted another canine sniff a few days later, on March 2, after the semi-truck had been moved by law enforcement to a secondary location away from the path of traffic. Though the canine then alerted to the passenger side of the truck, no evidence was found. [Hearing Recording at 30:40-33:02, 26:00-27:00, 29:05].

narcotics purchases with Perez and others and establishing the DTO's connection to the Fort Harrods Drive location, investigators obtained tracking warrants for the Civic, the Elantra, and the Tacoma. [Joint Aff. ¶ 5; Hearing Recording at 8:25-9:45]. During this time and thereafter, investigators observed the DTO's operating procedures, including narcotics and cash drops at rest stops using duffel bags. [Hearing Recording at 10:00-11:50]. Law enforcement particularly observed one exchange on February 7, 2022, during which Perez and fellow alleged DTO member Alberto Perez Tadeo ("Tadeo") appeared to exchange a duffel bag inside of the Fort Harrods Drive apartments before Tadeo entered the Tacoma with the bag.[5] [Joint Aff. ¶¶ 6-9]. A traffic stop and search of the Tacoma revealed $181,850 in cash wrapped in clear plastic and rubber bands inside of the duffel bag. Investigators also observed Perez and Corona circling the area surrounding the traffic stop scene. [Hearing Recording at 11:55-13:55].

Notably, neither Homedes nor Monteagudo is implicated in any of the surveillance or other investigative efforts preceding February 28, 2021, despite the clear historical operation of this DTO in late 2021 and early 2022. The United States argues that their obvious familiarity with Corona at the rest stop, as captured in the footage, shows that they have had historical involvement in this DTO. Indeed, Homedes and Monteagudo are not from Lexington and have no apparent connection to Lexington, but Corona is a Lexington resident. The available evidence of their interactions—consisting only of the duffel bag exchange at the rest stop—does circumstantially suggest a drug-related common link. Defendants did not offer any contrary, legitimate explanation for their relationship with Corona.

---

[5] The Joint Affidavit and TFO Steward's testimony confirm that investigators do not believe this to be the same duffel bag as the one exchanged by Homedes.

15

Nonetheless, the Court can conclude from this record at most that Homedes, Monteagudo, and members of this DTO (including Corona) are familiar with one another through the drug trade generally. The length, extent, and nature of that relationship—and by proxy, the length, extent, and nature of Homedes's and Monteagudo's possible participation in drug trafficking—is entirely unknown. Given the lack of any concrete evidence placing either Homedes or Monteagudo in relation to this DTO prior to February 28, despite numerous investigative steps monitoring the conspirators, the Court declines to speculate that their involvement in the DTO occurred with (anywhere near) the same intensity and frequency as the activities implicitly characterized as illustrative of the DTO's operation in late 2021 and early 2022. In other words, though the evidence demonstrates a pattern of intimate historical involvement in regular, high-quantity drug trafficking relative to several DTO members, such evidence is not present as to Homedes and Monteagudo, and the record concerning their familiarity with Corona does not alone support imputing those details to Homedes or Monteagudo in full.

There is thus no evidence that Homedes and Monteagudo are playing any long-term roles, much less high-level ones, in the instant DTO. *Cf. United States v. Newby*, No. CR 19-CR-20492-4, 2020 WL 6781567, at *3 (E.D. Mich. Nov. 18, 2020) (finding great weight of dangerousness evidence where the facts depicted the defendant as playing an important leadership role in the alleged drug conspiracy). Nor, even if their connection to Corona is foundationally drug-tied, is there any credible proof concerning what drugs, quantities, or activities were precisely involved. *Cf. United States v. Corrales*, 5:20-cr-00128-DCR-MAS, at E.C.F. No. 34 (finding danger-based detention warranted where historical evidence linked the defendant directly to the co-conspirators, to one of the DTO's distribution/packaging locations, and to involvement with the at-issue controlled substances themselves roughly ten months prior to the indicted events).

16

One interpretation of the nebulous proof, as the Government urges, is that Homedes and Monteagudo are suppliers for this DTO, explaining their external, peripheral involvement; under this theory, the fact that they retrieved no cash during the duffel bag exchange speaks to the sophisticated operation of the DTO. Another—more Defendant-favorable—take, though, is that Homedes and Monteagudo are mere couriers, trusted with a large quantity of drugs no doubt, but not with the attendant cash. At bottom, there is insufficient evidence to choose between these competing narratives, and far from clear and convincing evidence that Homedes and Monteagudo are indeed dangerous suppliers of a large-scale DTO.

The absence of such proof in this case cuts against the likelihood that Homedes and Monteagudo are so enmeshed in the DTO as to continue trafficking even if released and offers some assurance that conditions may halt the conduct. And, Defendant does not have any criminal history, drug-related or otherwise, or substance use disorder in his record that would indicate participation in drug-related conduct more broadly. Defendant's steady past employment and prospects for other future employment further support his release and indicate likely compliance with conditions. *See* 18 U.S.C. § 3142(g)(3)(A) (considering the defendant's employment history, criminal history, and substance use disorder history).

For all of these reasons, the Court does not find weighty evidence of Defendant's dangerousness on this record, given the limited evidence of Defendant's role in the offense and the absence of any criminal history or other aggravators in Defendant's background. The (g)(2) and (g)(3) factors thus weigh in favor of Monteagudo's release.

### 3. Nature and Seriousness of the Danger

Finally, the Court weighs "the nature and seriousness of the danger to any person or the community that would be posed by the person's release[.]" 18 U.S.C. § 3142(g)(4). The nature of the risk in this case is limited to continued trafficking, as there is no evidence of related or other

17

violence on this record. *United States v. Pina-Aboite*, 97 F. App'x 832, 836 (10th Cir. 2004) (emphasizing that "the danger-to-the-community factor is not simply about physical violence; the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the community").

Such risk is somewhat muted by the lack of evidence connecting Monteagudo to the DTO over a longer period of time or in a managerial role, as discussed. *Cf. United States v. Bucio*, No. CR 5:17-055-DCR, 2019 WL 4397334, at *3 (E.D. Ky. Sept. 13, 2019) (finding that the alleged offense circumstances favored detention where they demonstrated that the defendant had a leadership role in a large-scale drug trafficking and money laundering scheme). And there are no violence or weapons issues on this record. *Cf. United States v. Taylor*, 289 F. Supp. 3d 55, 64 (D.D.C. 2018) (observing that "the combination of the distribution of drugs and the illegal possession" of firearms presented a serious danger to the community). This record thus lacks many of the more serious danger markers frequently present in detention-justifying drug trafficking cases.

Accordingly, with no facts particularly heightening the seriousness of the danger risks in this case, the Court finds that this final factor does not support detention based on danger.

### 4. **Availability of Danger Conditions**

Though the balance of danger factors does not favor detention on this record, it does confirm some danger risk. Critically, however, conditions are available to guard against it and to reasonably assure community safety under the circumstances. As discussed in relation to flight, the Court will impose home detention, GPS monitoring, travel restriction, passport surrender, and other conditions governing Monteagudo's release. With these limitations and monitoring mechanisms in place, the Court is reasonably assured that Monteagudo will discontinue any drug trafficking activities. Notably, his alleged criminal conduct correlates with his over-the-road truck

18

driving and targets out-of-state rather than local areas, and there is no indication that he is so central to the DTO that he has extensive drug contacts and the ability to further the scheme remotely from Texas. *Cf. United States v. Nova*, No. CR 16-060-02 S, 2016 WL 6471205, at *2 (D.R.I. Nov. 1, 2016) (finding that electronic monitoring and home detention conditions would not be effective to mitigate danger where the defendant had already participated in the charged heroin distribution scheme from his own home, where he proposed to be released).

The Court thus finds that the travel restriction, home detention, and GPS monitoring conditions will keep the USPO adequately apprised of Monteagudo's activities and reasonably assure that he cannot traffic narcotics on release.

## IV.   CONCLUSION

For the reasons here discussed, the Court finds that the Government has not shown by a preponderance of the evidence that no conditions can reasonably assure that Defendant will not flee and that he will appear at future proceedings in this case. The Government also has not shown by clear and convincing evidence that no conditions can reasonably address any danger risk Monteagudo poses. Accordingly, the Court finds detention unwarranted under the BRA, **DENIES** the Government's oral motion, and **RELEASES** Monteagudo on conditions consistent with this opinion. The Court will enter a separate order outlining the specific conditions of release.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145(a).

Entered this the 18th day of March, 2022.



Signed By:
Matthew A. Stinnett   MAS
United States Magistrate Judge

19